

The following constitutes the order of the Court.
Signed: September 13, 2023

_____
**Charles Novack**
**U.S. Bankruptcy Judge**

# UNITED STATES BANKRUPTCY COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re: | Case No. 21-40548 CN |
| | Chapter 11 |
| MARK F. LUCIDO,<br>Debtor. | |
| | |
| RGW CONSTRUCTION, INC., | Adversary No. 21-4031 CN |
| Plaintiff, | **MEMORANDUM DECISION RE:** |
| vs. | **CHAPTER 11 DISCHARGE** |
| MARK F. LUCIDO, | |
| Defendant. | |

On June 6, 2023, June 8, 2023 and July 12, 2023, this court conducted a trial on plaintiff RGW Construction, Inc.'s ("RGW") complaint to deny Chapter 11 debtor Mark Lucido ("Lucido") a chapter 11 discharge under Bankruptcy Code §1141(d)(3) (the "Complaint"). All appearances were noted on the record. The following constitutes the court's findings of fact and conclusions of law pursuant to Federal Rule of Bankruptcy Procedure 7052.

/ / / /

/ / /

**The RGW Judgment**

Before he filed his Chapter 11 bankruptcy, Lucido was the 100% owner of Bay Area Drilling, Inc., an entity involved in the heavy construction drilling business ("BAD"). In September 2014, RGW and BAD executed two subcontracts for BAD to provide drilling and installation services for a California Department of Transportation project on Highway 880 in Oakland. In August 2017, RGW terminated the subcontracts for cause and on November 28, 2018, RGW sued BAD in Alameda County Superior Court.

On January 7, 2020, the Alameda County Superior Court entered a $1,781,538.79 judgment in favor of RGW (the "Judgment"), which RGW then sought to enforce. In response to RGW's enforcement efforts, Lucido took steps to protect his real property interests by, among other things, formally documenting debts that he allegedly owed to family members relating to the construction, development and improvement of two parcels of real property. On March 9, 2020, Lucido transferred a 50% ownership in his Arnold, California residence (the "Arnold Property") to his mother, Geraldine Lucido ("Geraldine"). On March 31, 2020, Lucido provided his brother, Frank Lucido, with a $162,000 deed of trust and MDL Associates, a corporation wholly owned by another brother, Mike Lucido, with a $336,000 deed of trust against Lucido's commercial property located in Pittsburg, California (the "Pittsburg Property")[1]. While much was made during trial regarding the consideration provided for these transfers, the evidence clearly suggested (as discussed in greater detail *infra*) that: a) Geraldine had provided part of the funds that were used to purchase the land and build the residence on the Arnold Property; and b) Lucido's brothers – both of whom are in the construction trade – helped renovate the Pittsburg Property.

**The BAD and Lucido Bankruptcies**

On December 22, 2020, BAD filed a chapter 7 bankruptcy petition (Case No. 20-41936). Marlene Weinstein was appointed chapter 7 Trustee (the "BAD Trustee"). The BAD bankruptcy case remains pending. Lucido then filed this SubChapter V Chapter 11

---

[1] The Pittsburg Property was already subject to a substantial first deed of trust.

Case: 21-04031   Doc# 113   Filed: 09/13/23   Entered: 09/13/23 14:05:56   Page 2 of 24

bankruptcy on April 21, 2021. Two significant BAD related claims have been filed in Lucido's bankruptcy. First, the BAD Trustee filed a $3.151 million unsecured proof of claim based on an alleged breach of fiduciary duty by Lucido to BAD, which caused BAD to breach its RGW subcontracts. Second, and notwithstanding the fact that the Judgment was entered only against BAD, RGW filed a $2,657,078.21 unsecured claim based almost entirely on its assertion that Lucido was BAD's alter ego and therefore equally liable for the Judgment[2].

On November 2, 2022, the BAD Trustee objected to RGW's proof of claim, alleging that: a) the Alter Ego Claim belonged to the BAD estate and RGW lacked standing to assert it; and b) RGW's claim was duplicative of the BAD Trustee's claim (the "Objection"). After briefing and a hearing, the court sustained the Objection and disallowed all but the $3,450 attributable to the sanctions award. On January 9, 2023, RGW appealed the order sustaining the Objection and elected to have the appeal heard by the District Court. RGW did not seek a stay pending appeal. On September 7, 2023, the District Court reversed this court's order sustaining the Objection, leaving RGW with its full $2,657,078.21 unsecured claim in this Chapter 11 (the ultimate resolution of which is still uncertain).

**The Plan**

On April 28, 2023, Lucido filed an amended Chapter 11 Small Business Subchapter V Plan (the "Plan").[3] The Plan provided, among other things, that Lucido would sell the Pittsburg Property and retain the Arnold Property and all of his personal property. Lucido proposed to fund the Plan with the sales proceeds of the Pittsburg property, his social security income, income derived from his consulting business (related to the drilling business) and his work as an employee out of Operating Engineers Local #3.

---

[2] RGW's proof of claim included a $3,450 sanctions award which the Alameda County Superior Court had levied directly against Lucido during the BAD litigation. The remaining amount of its claim was based on its alter ego argument (the "Alter Ego Claim").

[3] The Plan is the fourth plan filed in this case. Lucido initially filed a plan on July 20, 2021, and filed amended plans on January 11, 2023, and February 17, 2023 (the "Second Amended Plan"). The Second Amended Plan came on for hearing on April 14, 2023, and confirmation was denied without prejudice. The current Plan followed.

- 3 -

**The Complaint**

RGW filed the Complaint on November 15, 2021, in response to Lucido's initial Chapter 11 plan. While some of the plan terms have changed over the various plan iterations, the funding methods have remained constant, and the Complaint is still relevant. RGW seeks to deny Lucido's Chapter 11 discharge under Bankruptcy Code §1141(d)(3). It alleges that Ludico is not entitled to a discharge because: (1) the Plan is a liquidating chapter 11 plan; (2) Lucido will not and cannot engage in "business" after Plan consummation; and (3) Lucido would be denied a discharge in a chapter 7 case[4] because he: (1) concealed, destroyed, mutilated, falsified or failed to keep or preserve his financial records by failing to produce BAD's financial records when asked to provide them during BAD's bankruptcy (*see* 11 U.S.C. §727(a)(3)); (2) gave false testimony when he stated under oath that his March 9, 2020 Arnold Property transfer to Geraldine was justified (*see* 11 U.S.C. §§727(a)(4) and (a)(5)); (3) issued a bogus post-petition promissory note to MF Engineering[5] in an attempt to defraud BAD's creditors (*see* 11 U.S.C. §§727(a)(4) and (a)(7)); and (4) offered money and property to his family members in order to gain an advantage and to defraud his creditors (*see* 11 U.S.C. §727(a)(4)(C)).

Since filing the Complaint, RGW appears to have abandoned some of its § 727(a) arguments and added others. In its trial brief and post-trial brief, RGW continues to maintain that Lucido would be denied a Chapter 7 discharge under §§727(a)(3) and (a)(4)(A) but makes no mention of (and thus has apparently abandoned) its §§727(a)(5) and (a)(7) arguments. RGW now also argues that Lucido would be denied a Chapter 7 discharge for: (1) transferring, removing, destroying, mutilating or concealing property of the estate under §727(a)(2)(B) and (2) refusing to obey a lawful order of the court under

---

[4] The Complaint also included a cause of action to add Lucido as a judgment debtor to the Judgment. This claim was effectively mooted by the court's December 27, 2022 order sustaining the BAD Trustee's Objection, and neither Lucido nor RGW, before or during trial, took any steps to dispose of it. The District Court's decision effectively revives RGW's Alter Ego Claim. The question is how the parties wish to address it.

[5] MF Engineering is an equipment rental and repair/maintenance company, and Lucido is its sole director, officer and shareholder. At trial, Lucido testified that MF Engineering had routinely loaned him money since January 2019 to help support BAD.

- 4 -

§727(a)(6)(A). RGW supports these new claims with assertions that Lucido refused to comply with a discovery order and has continually concealed evidence regarding MF Engineering. RGW did not move to amend the Complaint before trial and has not moved to amend the Complaint according to proof. Regardless, Lucido has not objected to the inclusion of these arguments, and the court will address them. *See* Fed.R.Civ.P. 15(b)(2), made applicable to this proceeding by Fed.R.Bankr.P. 7015.[6]

## I.    <u>Conclusions of Law</u>

As stated above, Lucido filed a SubChapter V Chapter 11 bankruptcy. Regardless of whether a SubChapter V plan is confirmed consensually under § 1191(a) or without the consent of all impaired creditors under § 1191(b), Bankruptcy Code §1141(d)(3) may still deprive a Chapter 11 debtor of their right to receive a Chapter 11 discharge. *See*, *e.g.*, Bankruptcy Code §§ 1181(a), 1191(a) and 1192. Section 1141(d)(3) provides,

> The confirmation of a plan does not discharge a debtor if –
> (A) the plan provides for the liquidation of all or substantially all of the property of the estate;
> (B) the debtor does not engage in business after consummation of the plan; and
> (C) the debtor would be denied a discharge under section 727(a) of this title if the case were a case under chapter 7 of this title.

11 U.S.C. §1141(d)(3).[7] Section §1141(d)(3) is written in the conjunctive and RGW must

---

[6] The court's decision to address these new arguments is also premised on RGW's lack of clarity in articulating and supporting its §727 arguments during trial. RGW's scattershot approach also compelled this court to forgo "dueling" post-trial briefs and require that RGW submit its closing brief first. As noted by the court at trial, "duel [sic] briefs probably won't work because I'm not quite sure, and I don't know if you are, Mr. Macdonald, exactly what 727 issues Mr. Nemecek is going to argue. And you'd probably be at a disadvantage without knowing that." Trial (Day 3) Transcript at 96:16-19.

[7] Upon further reflection, this court questions its decision to conduct the trial herein before plan confirmation. By its plain language, §1141(d)(3) is premised on a plan being confirmed, and Lucido has yet to confirm a plan. While confirmation of the Plan was pending throughout the trial, this court ultimately denied confirmation of the Plan (by order dated August 8, 2023) due to lack of feasibility. Notwithstanding this court's denial of plan confirmation, the discharge question before this court is not moot. "A case becomes moot only when it is impossible for a court to grant 'any effectual relief whatever' to the prevailing party." *Knox v. SEIU, Local 1000*, 567 U.S. 298, 307, 132 S.Ct. 2277, 183 L.Ed.2d 281 (2012) (quoting *Erie v. Pap's A.M.*, 529 U.S. 277, 287, 120 S.Ct. 1382, 146 L.Ed.2d 265 (2000)). "As long as the parties have a concrete interest, however small, in the outcome of the litigation, the case is not moot." *Knox*, 567 U.S. at 307-08 (quoting

- 5 -

therefore establish each element by a preponderance of the evidence. *Fed.R.Bankr.P.* 4005; *Retz v. Samson (In re Retz)*, 606 F.3d 1189, 1196 (9th Cir. 2010) (citing *Khalil v. Developers Sur. & Indem. Co. (In re Khalil)*, 379 B.R. 163, 172 (9th Cir BAP 2007), *aff'd* 578 F.3d 1167, 1168 (9th Cir. 2009)); *A & H Ins., Inc. v. Huff (In re Huff)*, 2014 WL 904537, at *4 (9th Cir. BAP, March 10, 2014) (citations omitted); *Beauchamp v. Hoose (In re Beauchamp)*, 236 B.R. 727, 730 (9th Cir. BAP 1999), *aff'd*, 5 Fed. Appx. 743 (9th Cir. 2001) (citing *Grogan v. Garner*, 498 U.S. 279, 284, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991)); *Brisman v. Parasram (In re Parasram)*, 647 B.R. 1, 16 (Bankr. E.D. N.Y. 2022) (citation omitted). Moreover, courts make every effort to guard a debtor's discharge and challenges to an individual debtor's discharge are narrowly construed. *Derusha v. Duncan (In re Duncan)*, 2012 WL 5462917, at *2 (Bankr. D. Ariz. Nov. 6, 2012) (citing *In re Khalil*, 379 B.R. at 172; *Bernard v. Sheaffer (In re Bernard)*, 96 F.3d 1279, 1281 (9th Cir. 1996); *In re Retz*, 606 F.3d at 1196; *In re Beauchamp*, 236 B.R. at 730).

### A. The Plan is a Liquidating Plan

RGW has demonstrated that the Plan provides for the liquidation of "all or substantially all of the property of the estate." 11 U.S.C. §1141(d)(3)(A). The Plan discloses estate assets totaling $4,130,092 and Lucido has claimed, without objection, $417,121 in exemptions, leaving nonexempt equity of $3,712,971 (the "Estate Property"). Of that amount, $3,400,289, or 91.5% is attributable to the value of the Pittsburg Property, which the Plan proposes to liquidate. [8] While Lucido is retaining the Arnold Property and his personal property, the non-exempt value of those assets pales in comparison to the assets being liquidated under the Plan. As a result, the court finds that liquidation of 91.5% of the value of Estate Property constitutes liquidation of "substantially all" of the property

---

*Ellis v. Railway Clerks*, 466 U.S. 435, 442, 104 S.Ct. 1883, 80 L.Ed.2d 428 (1984)). Lucido has since filed an amended plan which closely resembles the one at issue in this adversary proceeding. Should RGW choose to renew its § 1141(d)(3) claim for relief, the evidence and arguments related to §§1141(d)(3)(A) and (B) would be substantially similar. Further, §1141(d)(3)(C) is independent of any plan proposed by Lucido. Thus, the parties have a concrete interest in the outcome of this litigation and the court can still grant meaningful relief.

[8] Lucido has already sold the Pittsburg Property by order dated May 2, 2023. The court is informed that the sale closed on July 28, 2023.

of the estate and the Plan is a liquidating plan.

**B. Lucido Will Engage in Business After Consummation of the Plan**

Chapter 11 was originally designed to address the financial woes of corporate debtors. *Um. v. Spokane Rock I, LLC*, 904 F.3d 815, 819 (9th Cir. 2018) (citing *Toibb v. Radloff*, 501 U.S. 157, 162-63, 111 S.Ct. 2197, 115 L.Ed.2d 145 (1991)). As a result, the application of the "engage in business" element of §1141(d)(3)(B) in a corporate case is relatively straightforward. Simply, "it is easy to conclude that a business entity will not engage in business post-bankruptcy when its assets are liquidated and the entity is dissolved." *Id.* (quoting *Spokane Rock I, LLC, v. Um (In re Um),* 2016 WL 7714141, at *3 (W.D. Wash. Aug. 18, 2016)). Its application, however, to the sometimes, peripatetic post-confirmation lives of individual debtors can be more difficult. *Id.*

RGW argues that the Ninth Circuit has interpreted the phrase "engage in business" to mean nothing more than the continuation of the debtor's pre-petition business, and that when this standard is applied herein, the Plan falls short. Lucido operated a drilling business (BAD) before he filed this case, and RGW asserts that Lucido: 1) is required to hold a contractor's license to operate the business; 2) has since relinquished his license; and 3) cannot renew it without committing fraud. *Ipso facto*, Lucido cannot contend that he will be engaging in business post-consummation.

RGW misconstrues the *Um* court's holding. In *Um*, the debtors co-founded several real estate management companies. They ultimately filed a Chapter 11 bankruptcy and their plan provided for the sale of their nonexempt individual assets as well as those of their jointly owned business entities. *Um*, 904 F.3d at 817. Creditor Spokane Rock filed an adversary proceeding seeking to deny debtors their Chapter 11 discharge under §1141(d)(3). *Id.* at 818. The bankruptcy court granted summary judgment to Spokane Rock and denied debtors' discharge finding, in part, that debtors did not engage in business after consummation of the plan because they would "no longer engage in their prepetition business, which was to manage specific LLCs and their properties." *Id.* at 819 (quoting *Spokane Rock I, LLC v. Um (In re Um)*, 2015 WL 6684504, at *7 (Bankr. W.D. Wash. Sept. 30, 2015)). The bankruptcy court read §1141(d)(3)(B) as requiring the

- 7 -

"continuation" of a debtor's prepetition business and found that requirement was not satisfied where one debtor was working part time for the plan administrator and the other debtor was employed by an unrelated party. *Id.* at 819. The District Court affirmed, and debtors appealed to the Ninth Circuit. *Id.* at 818. The Ninth Circuit declined to decide whether an individual debtor had to continue their prepetition business post consummation to satisfy §1141(d)(3)(B), stating instead,

> [W]e need not determine today whether the statutory prohibition on discharge is triggered only when an individual debtor continues a prepetition business after consummation of a Chapter 11 plan. The Debtors in this case fail to satisfy the second prong of the statute because they did not engage in *any* business during the relevant period. They were simply employees in businesses owned or operated by others – and Price a part-time employee at that.

*Id.* at 820 (emphasis in original). Thus, there is no binding Ninth Circuit caselaw and the court must examine this issue anew.[9]

The task of resolving a statutory dispute begins with the language of the statute itself. *U.S. v. Ron Pair Enters., Inc.*, 489 U.S. 235, 241, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989) (citation omitted). The operative understanding is that Congress "says in a statute what it means and means in a statute what it says there." *Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.*, 530 U.S. 1, 6, 120 S.Ct. 1942, 147 L.Ed.2d 1 (2000) (quoting *Connecticut Nat. Bank v. Germain*, 503 U.S. 249, 254, 112 S.Ct 1146, 117 L.Ed.2d 391 (1992)). Where the language of the statute is plain, so long as the disposition required by the text is not absurd, the judicial inquiry of the court is complete, and the function of the

---

[9] Nor is the non-binding authority plentiful, consistent, or particularly helpful. *See Grausz v. Sampson (In re Grausz)*, 63 Fed.Appx. 647, 650 (4th Cir. 2003) (relying on corporate bankruptcy cases to find debtor would not engage in business after plan consummation where debtor worked as a consultant for a "business unrelated to the entities at issue in the bankruptcy" because "[it] seems clear to us that §1141(d)(3)(B) does not refer to basic employment by an individual debtor but to the *continuation of a pre-petition* business[.]"); *In re Parasram*, 647 B.R. at 17 (Debtor was not engaged in business where he worked as a part time employee for a store which he had no ownership interest in); *In re Owens*, 207 B.R. 520, 526, n.1 (Bankr. E.D. Ky. 1996) (Debtor's post-consummation employment by pre-petition business did not constitute engaging in business); *But see Suarez v. Suarez (In re Suarez)*, 2007 WL 7024926, at *3 (Bankr. S.D. Ga. Feb. 8, 2007) (finding that licensed medical doctor who intended to continue to practice medicine in a different locale was engaged in business notwithstanding the liquidation of his pre-petition practice).

- 8 -

court is to enforce the statute according to its terms. *Id.* (citing *U.S. v. Ron Pair Enters., Inc.*, 489 U.S. at 241); *Rubin v. U.S.,* 449 U.S. 424, 430, 101 S.Ct. 698, 66 L.Ed.2d 633 (1981).

Section 1141(d)(3)(B) states, "The confirmation of a plan does not discharge a debtor if –. . . . the debtor does not engage in business after consummation of the plan[.]" *11 U.S.C. §1141(d)(3)(B).*  The text of the code section is plain and contains one simple query – will the debtor "engage in business" after consummation of the plan?  The court finds it notable that there are no modifiers or qualifiers regarding the type or form of business that will satisfy the requirement. The text does not say "the debtor does not **continue to engage** in business after consummation of the plan," nor does it say, "the debtor does not engage in business **of the type engaged in pre-petition** after consummation of the plan."  The statute is stated in the present tense, is forward-looking, and simply requires that the debtor "engage in business" post-consummation.  The court declines to insert a business continuity requirement into the statute where none exists.  As a result, §1141(d)(3)(B) does not mandate that an individual debtor continue their pre-confirmation business into their post-consummation lives.

That does not end the inquiry, however, as the court must still address whether Lucido intends to engage in "business."  The Bankruptcy Code does not define this term, but Black's Law Dictionary defines "business" very broadly, as "[a] commercial enterprise carried on for profit; a particular occupation or employment habitually engaged in for livelihood or gain." *Black's Law Dictionary* (11th ed. 2019).  The Official Bankruptcy Forms limit this expansive definition somewhat by specifically identifying five categories that constitute a business for bankruptcy purposes, including: (1)  a sole proprietor or self-employed in a trade, profession, or other activity, either full-time or part time; (2) a member of a limited liability company (LLC) or limited liability partnership (LLP); (3) a partner in a partnership; (4) an officer, director, or managing executive of a corporation; and (5) an owner of at least 5% of the voting or equity securities of a corporation. *Fed.R.Bankr.P. Official Form B 107* (2022), at Part 11.  The instructions that accompany Official Form B 107 also help to clarify what is considered a "business" for bankruptcy purposes, and

- 9 -

provide, "If you are in business as a sole proprietor, partner, family farmer, or self-employed professional, you must provide the information about all of your business and personal financial activities." *Instructions: Bankruptcy Forms for Individuals (Dec. 2015, rev. April 2022)* at p. 32. Finally, caselaw, while inconsistent in other respects, uniformly limits the definition by holding that a debtor working as a mere employee is not in "business" for purposes of §1141(d)(3)(B). *See Um*, 904 F.3d at 82: "reading §1141(d)(3)(B) to include mere employment would create severe dislocations in the broader statutory scheme;" *In re Grausz*, 63 Fed.Appx. at 650: §1141(d)(3)(B) does not refer to basic employment by an individual debtor; *In re Parasram*, 647 B.R. at 17: Debtor was not engaged in business where he worked as a part time employee for a store which he had no ownership interest in; *In re Owens*, 207 B.R. at 526, n.1: Debtor's post-consummation employment by pre-petition business did not constitute engaging in business.

Lucido testified that he deactivated his contractor's license in 2019 and has generated income since then by working out of his union hall and providing "self-employed independent" consulting services to S.G. Banks. His consulting services involves all phases of cast wet and dry hole drilling, including inspecting potential drilling sites and advising contractors (to date, S.G. Banks) who are interested in bidding for the drilling subcontract. Given his experience with BAD, Lucido appears to be well suited for this work.

S.G. Banks issued Lucido W-2s for employment wages and 1099s for his consulting work in 2021 and 2022. These post-petition tax documents and his Chapter 11 monthly operating reports disclose that his consulting work generated the bulk of his (non-rental) post-petition income[10], and the Plan proposes that Lucido will expand his consulting business, continue to work out of the union hall, and start to receive social security. There is no strong indication that his consulting business will slacken post-consummation, and

---

[10] Lucido rented the Pittsburg Property to several commercial tenants. That income ended when the sale closed on July 28, 2023.

- 10 -

the fact that this work will not be the sole source of funds does not prevent this court from determining that he will be "engaging in business." *See In re Flintkote Co.*, 486 B.R. 99, 132 (Bankr. D. Del. 2012) (there is no language in the statute qualifying what level of business activity is sufficient). Accordingly, the court finds that RGW has not met its burden of proof on this element, and judgment can be entered in Lucido's favor on this basis alone.

## C. RGW's §727 Claims Will Not Result in a Denial of Discharge

As noted previously, RGW appears to have abandoned previously plead legal bases, added new legal bases, and alleged new facts to support its argument that Lucido would be denied a discharge if this case were a chapter 7. At the completion of its case-in-chief, and consistent with its trial brief and post-trial brief, RGW's counsel confirmed that the remaining bases for denial of discharge are §§727(a)(2)(B), (a)(3), (a)(4)(A) and (a)(6)(A).

### 1. 11 U.S.C. §727(a)(2)(B)

Section 727(a)(2)(B) provides,

The court shall grant debtor a discharge, unless –
. . . .
the debtor, with the intent to hinder, delay or defraud a creditor. . . has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed
. . . .
property of the estate, after the date of the filing of the petition[.]

11 U.S.C. §727(a)(2)(B). Actual intent to hinder, delay or defraud must be shown. *Devers v. Bank of Sheridan, Mont. (In re Devers)*, 759 F.2d 751, 753 (9th Cir. 1985). "Whether a debtor harbors 'intent' to hinder, or to delay, or to defraud. . . a creditor is a question of fact that requires the trier of fact to delve into the mind of the debtor and may be inferred from surrounding circumstances." *Searles v. Riley (In re Searles)*, 317 B.R. 368, 379-80 (9th Cir. BAP 2004) (citing *Emmett Valley Assocs. v. Woodfield (In re Woodfield)*, 978 F.2d 516, 518 (9th Cir. 1992)).

RGW argues generally that Lucido has continually concealed evidence concerning the operations and finances of M.F. Engineering. Specifically, RGW argues that while

- 11 -

Lucido produced M.F. Engineering's bank statements, he failed to produce copies of the checks referenced in those statements. RGW argues that Lucido refused to produce copies of these checks because he was using M.F. Engineering assets to pay his personal expenses. As a result, RGW argues that M.F. Engineering's diminishing cash reserves equally decreased the value of Lucido's equity interest in M.F. Engineering. This, RGW alleges, constitutes post-petition concealment of estate property.

RGW's argument is undermined by its unwillingness to appreciate (despite the court's repeated admonitions) that M.F. Engineering's assets are not property of Lucido's estate. The only thing that is property of Lucido's estate is Lucido's equity interest in M.F. Engineering, the value of which is measured not only by its cash on hand, but also by the debts it owed (the latter of which RGW failed to explore at trial). Accordingly, arguments that Lucido was using M.F. Engineering cash for personal expenses, without sufficient evidence that it eroded Lucdio's equity, are inadequate to prove that such conduct somehow constituted the concealment of estate property (particularly when the evidence suggested that MF Engineering was, at all relative times, insolvent).

RGW also has not established that Lucido acted with the requisite intent. Lucido produced M.F. Engineering's bank statements (which listed the checks drawn against its account) as well as copies of M.F. Engineering's general ledgers (which contained consistent, corresponding entries of the above checks and categorized those expenses paid by those checks). This is not the behavior of someone who has the intent to hinder, delay or defraud.

In addition, the evidence does not persuasively demonstrate that Lucido used M.F. Engineering funds for personal expenses. For example, RGW took issue with some of the insurance, alarm and gas/vehicle maintenance expenses that M.F. Engineering paid, contending that these payments personally benefitted Lucido. Lucido testified that the insurance and alarm expenses were for M.F. Engineering's business premises located on the Pittsburg Property and the gas/maintenance expenses were for a truck that M.F.

- 12 -

Engineering rents from Lucido[11]. Lucido also testified that while M.F. Engineering was in the process of closing, it was not closed yet and was still incurring business expenses. RGW produced no evidence to the contrary.

Assuming for the sake of argument that Lucido did use M.F. Engineering funds for personal expenses, there is no evidence that he did so to hinder, delay or defraud his creditors. Lucido testified that if these expenses were not paid by M.F. Engineering, they would have been paid with funds in the debtor in possession account. While his personal creditors and the United States Trustee most likely would have frowned upon such expenditures, his use of M.F. Engineering's funds (at least in this hypothetical) disclose an intent to preserve the funds of this bankruptcy estate.

Accordingly, the court finds that RGW has not demonstrated by a preponderance of the evidence that Lucido transferred, removed, destroyed, mutilated, or concealed property of the estate with the intent to hinder, delay or defraud a creditor.

### 2. 11 U.S.C. §727(a)(3)

Section 727(a)(3) provides,

The court shall grant the debtor a discharge, unless –

. . . .

The debtor has concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information, including books, documents, records, and papers, from which the debtor's financial condition or business transactions might be ascertained, unless such act or failure to act was justified under all of the circumstances of the case[.]

11 U.S.C. §727(a)(3). The "purpose of §727(a)(3) is to make discharge dependent on the debtor's true presentation of his financial affairs." *Caneva v. Sun Cmtys. Operating Ltd. P'ship (In re Caneva)*, 550 F.3d 755, 761 (9th Cir. 2008) (citing *Lansdowne v. Cox (In re Cox)*, 41 F.3d 1294, 1296 (9th Cir. 1994)). This section "does not require absolute completeness in making or keeping records. *Id.* (citing *Rhoades v. Wikle*, 453 F.2d 51, 53 (9th Cir. 1971)). Rather, "the debtor must 'present sufficient written evidence which will

---

[11] While Lucido admittedly drove that truck, this is a predictable consequence of a wholly owned and operated corporation.

- 13 -

enable his creditors reasonably to ascertain his present financial condition and to follow his business transactions for a reasonable period in the past.'" *Id.* (quoting *Rhoades*, 453 F.2d at 53). A debtor's "duty to keep records is measured by what is necessary to ascertain his financial status." *Hussain v. Malik (In re Hussain)*, 508 B.R. 417, 424 (9th Cir. BAP 2014) (quoting *Moffett v. Union Bank*, 378 F.2d 10, 11 (9th Cir. 1967)).

A creditor must demonstrate under §727(a)(3) that: (1) the debtor failed to maintain and preserve adequate records, and (2) such failure makes it impossible to ascertain the debtor's financial condition and material business transactions. *In re Caneva, 550 F.3d at 761* (citing *In re Cox*, 41 F.3d at 1296). Once the objecting party shows that debtor's records are inadequate or do not exist, the burden of proof then shifts to debtor to justify the inadequacy or nonexistence of the records. *Id.* (citing *In re Cox*, 41 F.3d at 1296-97).

It is unclear what RGW's current arguments are, or if it has abandoned this basis entirely. In the Complaint, RGW asserted that Lucido had previously testified that his financial records were on a hard drive that had been stolen when in, fact, he had the records in his possession but failed to produce them. Notwithstanding the argument, no evidence was presented during trial to substantiate this claim for relief.

RGW's Trial Brief and Post-Trial Brief are equally unhelpful as both cite §727(a)(3) but provide no specific facts or analysis in support.[12] The court declines to speculate as to or construct RGW's argument, and as a result RGW failed to meet its burden of proof.

### 3. 11 U.S.C. §727(a)(4)(A)

Section 727(a)(4)(A) provides,

The court shall grant the debtor a discharge, unless –
. . . .
the debtor knowingly and fraudulently, in or in connection with the case –
. . . made a false oath or account[.]

---

[12] Each of the other three §727(a) bases asserted in the Trial Brief and Post-Trial Brief were discussed in distinct paragraphs under separate headers. Section 727(a)(3) was given no such treatment. The only reference to §727(a)(3) in the Trial Brief and Post-Trial Brief was in the introductory paragraphs outlining the bases for denial of discharge under §727(a), generally.

- 14 -

11 U.S.C. §727(a)(4)(A). The fundamental purpose of this subsection is to "insure that the trustee and creditors have accurate information without having to conduct costly investigations. *In re Retz*, 606 F.3d at 1196 (quoting *In re Khalil*, 379 B.R. at 172). To prevail on a §727(a)(4)(A) claim, a plaintiff must show: "(1) the debtor made a false oath in connection with the case; (2) the oath related to a material fact; (3) the oath was made knowingly; and (4) the oath was made fraudulently." *Id.* at 1197 (quoting *Roberts v. Erhard (In re Roberts)*, 331 B.R. 876, 882 (9th Cir. BAP 2005)).

RGW alleges Lucido's October 12, 2021, declaration in support of confirmation of a prior plan (the "Declaration")[13] contains numerous false statements about the underlying reasons for the transfer of 50% of the Arnold Property to his mother Geraldine and about the alleged debts underlying the issuance of deeds of trust against the Pittsburg Property to his two brothers, Frank and Mike (via MDL Associates).

It is undisputed that the Declaration was signed by Lucido under penalty of perjury, was filed in this Chapter 11 and related to material facts. Thus, the real inquiry is whether the statements were knowingly false and fraudulently made.

### a. The Arnold Property

RGW asserts that the following statements in the Declaration are false: (1) Geraldine advanced 50% of the cost to construct the residence on the Arnold property, the amount of which totaled more than $450,000; (2) Geraldine agreed to get off title to allow for refinancing; and (3) in 2020, Geraldine demanded to be restored to title to protect her interests. RGW argues that Lucido's failure to produce documentation showing that Geraldine paid for any of the costs of construction, combined with Geraldine's pattern and practice of documenting debts Lucido owed to her, and his subsequent signing of three Personal Financial Statements which did not disclose Geraldine's ownership interest, satisfies its burden of proof. While this is a close call, the court disagrees.

The court agrees that Lucido failed to produce explicit, documentary evidence to

---

[13] The Declaration was filed in support of Lucido's initial Chapter 11 plan (filed on July 20, 2021). That plan never came on for confirmation and the court did not consider the Declaration in denying confirmation of the Plan.

- 15 -

support the statements that Geraldine advanced 50% of the cost to construct the residence or that the amount advanced was more than $450,000. The circumstantial evidence, however, indicates that Geraldine probably provided substantial funding for the Arnold Property. The Arnold Property was purchased in 2002 and subsequently placed in the name of La Varaca Properties, LLC, an entity jointly owned by Lucido, Geraldine, Michael Lucido (and his spouse) and Lucido's sister (and her spouse) with the goal of building a cabin on the premises. In 2005, before any extensive work had been done on the project, Lucido's siblings withdrew from the LLC due to the construction cost and time involved. Geraldine and Lucido purchased their LLC interests and then continued with the Arnold Property's development, which they ultimately completed.

RGW must demonstrate, by a preponderance of the evidence, that Geraldine did not advance 50% of the construction costs which totaled more than $450,000. Evidence regarding the actual cost of construction and Geraldine's financial net worth and liquidity would have been good first steps towards meeting this burden of proof, but RGW did not introduce any such evidence. Instead, the evidence disclosed that: 1) Geraldine was involved with the Arnold Property from the inception and that she and Lucido were the only two owners after Lucido's siblings withdrew from the project; 2) she regularly loaned funds to Lucido; and 3) Lucido was compelled to eventually refinance the Arnold Property after its completion to obtain funds for his business ventures. This evidence suggests that Lucido may have lacked the capital to complete the Arnold Property on his own and that his mother, who was a regular source of funds for him (and who owned a half interest in the Arnold Property), provided it instead[14]. Moreover, while Geraldine may have carefully

---

[14] RGW's exhibits demonstrate that Geraldine contributed funds for the Arnold Property. The December 21, 2002 grant deed (which documented the sale to the Lucido family members) indicate that Geraldine initially purchased a 25% interest in the Arnold Property, and the recitals in the October 10, 2005 settlement agreement between the Lucido family members state that she had "heretofore" invested $42,500.00 "in connection with their acquisition and initial development expenses relating to the Arnold Property." The recitals further stated that Lucido and she also had made "various claims against [the other owners] for work and materials supplied for the development of the Arnold Property which have become the subject of a dispute . . . ." It cost Lucido and Geraldine another $60,000 to purchase the LLC interests held by Lucido's sister and brother.

- 16 -

documented her loans to Lucido, the funds that she contributed to the Arnold Property were not loans but an investment in real property in which she, at the time, had a 50% interest. There was no need for a document to establish an interest rate and a maturity date, and no testimony was solicited regarding the operations and/or underlying documents (including the operating agreement) of La Varaca Properties LLC.[15] Accordingly, the court reasonably infers that Lucido's business ventures prevented him from contributing all of the funds necessary to complete the project, and that he relied on his mother to help carry the load.[16] To be clear, the court is not conclusively finding that Geraldine funded the Arnold Property to the tune of $450,000 or more, or that she paid for half of its construction; instead, it holds that RGW did not demonstrate by a preponderance of the evidence that Lucido's statement that Geraldine advanced 50% of the cost to develop the Arnold Property and that the amount advanced was more than $450,000, was false.

Lucido also did not perjure himself when he asserted that Geraldine agreed to get off title to allow him to refinance the Arnold Property. RGW argues that Lucido's declaration was false because there was more than sufficient equity in Lucido's 50% interest to secure the amount of business capital that he needed. RGW's argument, however, does not address nor negate Geraldine and Lucido's testimony on this issue. Lucido testified that he needed to borrow against the Arnold Property to obtain working capital for his business. Both Lucido and Geraldine testified that Geraldine agreed that La Varaca Properties, LLC should transfer the Arnold Property to Lucido because she did not

---

[15] RGW's reliance on the three personal financial statements submitted by Lucido to the Bank of Agriculture and Commerce (dated December 15, 2010, March 1, 2012, and December 1, 2012) is flawed. When Lucido signed these financial statements, he was the sole person on title to the Arnold Property. RGW argues that Lucido's financial statements do not state that he was obligated to restore Geraldine to title but do disclose that he was flush with cash. First, the financial statements don't reflect Lucido's cash flow when the Arnold Property was being built, and second, RGW wants me to rely on this information while at the same time arguing that Lucido has no compunction from committing fraud on his creditors. Beyond Lucido's statement that he was the sole fee owner of the Arnold Property, the court takes no position on the veracity of the information contained in these financial statements, and no party inquired into their contents beyond the question of title.

[16] The evidence indicates, however, that Lucido invested significant "sweat" equity in the Arnold Property.

- 17 -

want to be responsible for the debt in any form. RGW produced no evidence to dispute this testimony. Thus, the court finds that RGW did not sustain its burden to show, by a preponderance of the evidence, that this statement was false.

Similarly, RGW did not meet its burden of proof regarding the alleged falsehood of Lucido's statement that Geraldine demanded to be restored to title in 2020 "to protect her interests." Both Geraldine and Lucido testified that Geraldine made this demand and her reasons for requesting it. RGW did not offer any contrary evidence. Lucido transferred a 50% interest to Geraldine after the Judgment (this fee title interest was the functional equivalent of her prior interest in La Varaca Properties, LLC), and the transfer was, perhaps, a not unexpected knee jerk response to RGW's efforts to enforce the Judgment (which ultimately included its Alter Ego Claim). Accordingly, RGW did not sustain its burden to show, by a preponderance of the evidence, that this statement was false, and RGW cannot prevail on this § 727(a)(4)(A) argument.

### b. The Pittsburg Property

RGW asserts that Lucido falsely stated that he gave his brothers, Frank and Mike (via MDL Associates) deeds of trust secured by the Pittsburg Property because he owed them money for construction and electrical work which they performed in 1996 and 1998. RGW argues that Lucido could not independently calculate the value of their work and did not produce any documents to support the amounts alleged. RGW further contends that it is "inconceivable" that the brothers would fail to document the debts for over twenty-five years, particularly given the family's heated dispute in 2005 which led to Mike Lucido's withdrawal from the Arnold Property development. RGW also argues that if Mike and Frank had provided the work as alleged, the Plan's treatment of their deeds of trust (they purportedly agreed to cancel their liens and allow Lucido to use the sales proceeds to help fund the Plan) made little sense.[17]

---

[17] RGW also appears to be arguing that the statement that Lucido owes a debt to Mike must be false because the deed of trust was issued to MDL Associates, which was not formed until 2005. The court does not find this fact to be compelling or particularly relevant. Mike testified that he has been a licensed general contractor for over 30 years and that when he did the work on the Pittsburg Property, his business name was Mike

- 18 -

Once again, the court agrees that Lucido failed to provide explicit documentation of the amounts due his brothers. That does not mean, however, that there was no evidence to support the amounts or the existence of the debts. Lucido testified that the value of his brothers' work was determined by permits, drawings and other documents pertaining to the construction (which documents were before the court). He also described the construction and electrical work that Frank and Mike performed, and generally agreed with Mike and Frank's explanation of the value of their work.

Mike and Frank's testimony regarding the nature of their deal with Lucido was consistent. Mike testified that he provided a wide range of construction services on the Pittsburg Property in 1996 and 1998, including building a new office for R&L Door Company (a tenant on the premises), making tenant improvements for Orkin Pest Control, and applying for a permit to construct a storage and maintenance facility and to install a modular office building. He testified that he calculated the value of his work by examining the plans/drawings and that he verbally quoted Lucido an amount - $163,000, which they agreed was a fair price. He further stated that Lucido and he agreed that they would settle the debt upon sale of the Pittsburg Property, Mike's retirement, or at some other mutually agreed time. Mike testified that this timetable was advanced due to the BAD litigation. When he generally became aware of the litigation, he informed Lucido that he needed some protection for his unpaid work, which resulted in the deed of trust. The $336,000 amount reflects the agreed upon $163,000 value and 3% interest for 25 years.

Frank's testimony mirrors that of his brother's. Frank, an experienced electrician, provided extensive electrical work on the Pittsburg Property, including work on the Orkin Pest Control and R&L Door Company spaces, electrical work for a new office in the back warehouse, new yard site lighting and power, and new LED lighting in the main shop. Frank testified that the Pittsburg Property needed substantial work when Lucido purchased it, and that they agreed that Lucido would pay for this work when Lucido sold the Pittsburg

---

Lucido, dba Bay Area Builders. His declaration describes his current business name as MDL Associates, Inc., dba Bay Area Builders, fka Mike Lucido dba Bay Area Builders. It makes perfect sense that the deed of trust would be issued to Mike's current business entity, and not to a defunct entity.

- 19 -

Property, upon Frank's retirement, or as otherwise agreed by the parties. Frank valued his work at $70,000 - $80,000. He testified that he met with Lucido in March of 2020 and they agreed that the value of the work was $78,000, plus 3% interest, for a total of $162,000.

Admittedly, the above evidence did not come bound in three punch binders with accountants in tow, and the court shares RGW's concerns regarding the significant passage of time between completion of work and execution of deeds of trust. But the court finds the Lucido brothers' testimony to be credible, and there is no evidence to the contrary. RGW's counsel did not effectively cross-examine Frank or Mike regarding the work they did on the Pittsburg Property nor its value. Accordingly, RGW failed to prove, by a preponderance of the evidence, that the statements Lucido made in the Declaration regarding the debts owed to Frank and Mike were false.

### 4.  11 U.S.C. §727(a)(6)(A)

Section 727(a)(6)(A) provides,

The court shall grant the debtor a discharge, unless –
. . . .
the debtor has refused, in the case –
. . . to obey any lawful order of the court, other than an order to respond to a material question or to testify.

11 U.S.C. §727(a)(6)(A). RGW contends that Lucido violated this section when he refused to comply with the court's September 20, 2022, Discovery Order issued in this adversary proceeding (the "Discovery Order").

Initially, the court notes that it has jurisdiction over the adversary proceeding, the underlying bankruptcy case and the parties. Thus, the Discovery Order is a lawful order as contemplated by §727(a)(6).[18] The next inquiry is whether Lucido "refused to obey" the Discovery Order. To prevail, RGW must show that Lucido was: (1) aware of the order and (2) willfully or intentionally refused to obey it (i.e., something more than a mere failure

---

[18] *See Vaughan v. Weinstein (In re Vaughan)*, 2016 WL 878308, at *7 (9th Cir. BAP Feb. 29, 2016) (citations omitted) (order is lawful where bankruptcy court has jurisdiction over the subject matter and the parties).

Case: 21-04031   Doc# 113   Filed: 09/13/23   Entered: 09/13/23 14:05:56   Page 20 of 24

to obey the order through inadvertence, mistake or inability to comply). *Farina v. Hoskins (In re Farina)*, 2023 WL 5165405, at \*5 (9th Cir. BAP Aug. 11, 2023) (quoting *Ebuehi v. U.S. Tr. (In re Ebuehi)*, 2022 WL 703911, at \*7 (9th Cir. BAP Mar. 8, 2022)). Lucido was aware of the Discovery Order. The issue, then, is whether he willfully or intentionally refused to obey it.

RGW argues that the Discovery Order required Lucido to provide detailed information regarding all asset transfers made by M.F. Engineering to any person in the period between June 1, 2017, through the present, and that Lucido failed to comply with it when he failed to produce copies of checks from M.F. Engineering's bank account(s). The Discovery Order itself, however, is not so specific. It provides, in relevant part,

> Defendant shall serve further responses to the Requests for Production Nos. 1-38. . . and shall produce all documents in his possession, custody and control that are responsive to those requests . . . no later than October 7, 2022.
> [and]
> Defendant shall serve further responses to Interrogatory Nos 1-6. . . no later than October 7, 2022.

*Discovery Order*, Plaintiff's Exhibit 75. Thus, determination of Lucido's compliance with the Discovery Order requires reference to, and review of, the Interrogatories and the Requests for Production.

Only one of the interrogatories refers to M.F. Engineering. Interrogatory No. 4 required Lucido to "Identify all transfers of Assets by M.F. Engineering to any Person from June 1, 2017 to the present." Pl. Exh. 67. This Interrogatory only requests information and does not request documents. Lucido timely filed further responses to Interrogatory No. 4 on October 7, 2022. Pl. Exh. 79. Thus, with respect to the Interrogatories, the court finds that Lucido obeyed the Discovery Order.

Unfortunately, the court cannot determine whether Lucido complied with the Requests for Production because they were never introduced into evidence at trial. Without that evidence, the court cannot find that Lucido refused to obey the Discovery Order at all, let alone that he refused to obey willfully or intentionally. As a result, RGW failed to sustain its burden to show by a preponderance of the evidence that Lucido refused to obey

- 21 -

a lawful order of the court[19].

### 5. 11 U.S.C. §§727(a)(5) and (a)(7)

As noted previously, these bases were asserted in the Complaint. However, no evidence or argument was presented at trial in their support, and they were not argued in RGW's trial brief or post-trial brief. To the extent that these bases were not waived, the court finds that RGW has not sustained its burden to show by a preponderance of the evidence that Lucido would be denied a discharge in a chapter 7 under §§727(a)(5) or (a)(7).

For all of the above reasons, the court finds that RGW has failed to sustain its burden to prove, by a preponderance of the evidence, that Lucido would be denied a discharge under §727(a) in a chapter 7 case. Thus, judgment can be entered in Lucido's favor on this basis alone.

## II. Conclusion

RGW has not demonstrated, by a preponderance of the evidence, all three elements of Bankruptcy Code § 1141(d)(3), and judgment shall be entered in Lucido's favor on this claim for relief. As stated above, the Complaint also includes a claim for relief to add Lucido to the BAD Judgment as BAD's alter ego. RGW failed to pursue this claim for relief after this court sustained the BAD Trustee's objection to RGW's proof of claim, and this claim for relief was never dismissed, either consensually or otherwise. The District Court's reversal of the Objection Order revives, at the very least, RGW's full proof of claim. The parties need to inform this court how they wish to proceed with the "Alter Ego" claim for relief. To the extent that they believe it should be litigated as part of this adversary proceeding in some form or fashion, this court will enter judgment on the § 1141(d)(3) claim for relief under Federal Rule of Bankruptcy Procedure 7054(b) and finds

---

[19] While not discussed in RGW's closing trial brief, RGW filed a motion in limine to compel Lucido to provide information and documents that he had purportedly failed to turnover during discovery, including M.F. Engineering checks. This court's June 23, 2023 order granted part of RGW's requested relief and ordered Lucido to, among other things, produce his 2022 W-2 form from S.G. Banks and to sit for another deposition. The order did not specifically address the M.F. Engineering checks, and RGW never sought additional relief nor asked this court to reconsider its order to include the checks.

- 22 -

that there is no just reason to delay entering a final judgment on this claim for relief.

The court will conduct a post-trial status conference on **September 29, 2023, at 11:00 a.m.** to determine how the parties wish to proceed. The parties may appear in person or by Zoom.

**\*\*\*END OF MEMORANDUM DECISION\*\*\***

Adversary No. 21-4031 CN

**<u>COURT SERVICE LIST</u>**

Recipients are ECF participants